IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 11-289-1 |
| | : | |
| CALVIN HICKS | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                **February 20, 2014**

In November 2011, Calvin Hicks was convicted of federal offenses arising out of the December 27, 2008, gunpoint robbery of Sunny's Grill and Beer (Sunny's) in Philadelphia following a jury trial at which Hicks's codefendant, William Cooper, testified against him, identifying Hicks as the organizer of the robbery.  Hicks asks this Court to grant him a new trial pursuant to Federal Rule of Criminal Procedure 33 based on newly discovered evidence that Cooper (1) has since admitted under oath that he falsely implicated Hicks in another, similar gunpoint robbery in his proffer sessions with federal agents in October 2011, (2) failed to disclose to agents his own involvement in other robberies, including the robbery he falsely claimed Hicks had committed, and (3) perjured himself at trial by denying that he continued to lie to agents after initially lying to them in a June 2011 interview.

Hicks acknowledges his motion is based on newly discovered impeachment evidence, which ordinarily is not a sufficient basis for a new trial, but argues this is the unusual case in which the impeachment evidence so undermines the testimony of the critical Government witness against him that a new trial is warranted.  While the Court agrees the new evidence presented by Hicks casts substantial doubt on Cooper's truthfulness, the Government presented significant other circumstantial evidence of Hicks's guilt at trial.  Upon review of the record, the Court finds this other evidence is sufficient to sustain Hicks's conviction and the newly

discovered evidence, if presented at a new trial, would not probably produce an acquittal.  For this reason, the motion will be denied.

**FACTS**

In the early morning hours of December 27, 2008, four males broke into the Tam family's residence above Sunny's, the business the Tams operate on the first floor of 2416 Rhawn Street in Philadelphia.[1]  The group gained access to the residence by climbing a ladder to a first-floor roof and breaking the glass in a door to the second floor of the building.  Once inside, the robbers removed the two Tam children from their rooms, ordered Mr. Tam and his son to undress, and forced the entire family into a bathroom at gunpoint, demanding money.  The robbers wore gloves and dark clothing, with masks partially covering their faces.  They ransacked the Tams' store and residence, taking money and other items.[2]

Edward Sarris and Anthony Sabatino, who lived a few doors away from the Tams in an apartment above another business on the same block, heard the sound of glass breaking around the time of the robbery.  Looking out the back window of the apartment, Sarris saw two individuals climbing down a ladder behind Sunny's.  He and Sabatino went outside and ran to the corner next to Sunny's (the intersection of Rhawn and Leonard Streets).  From the corner, they observed two males run down Leonard Street and jump into a gray Range Rover parked approximately one block away.  Sarris and Sabatino then saw the Range Rover drive around the block and turn down Leonard Street, blowing its horn while the occupants covered their faces.

---

[1] Kitty and Peter Tam both testified there were four robbers.  Their daughter, Windy, testified she was awakened by "four or five strange, masked people standing in front of [her] bed."  Trial Tr. 31, Nov. 2, 2011.  Their son, Sunny, could not recall how many people came into his bedroom during the robbery.

[2] Mrs. Tam testified that in addition to the money, the robbers took a ring, a phone, an iPod, and Dutch Masters cigars.

After going back inside their apartment to call the police, they observed from the back window two more males climb down a ladder and run down the alleyway behind the buildings.

A short time later, a police officer stopped Cooper and another male, S.B.,[3] on foot a few blocks from the scene of the robbery and drove them back to Rhawn Street, where Sabatino identified them as the males he had observed descending the ladder behind Sunny's.  While Cooper and S.B. were sitting in a police vehicle, waiting to be taken to the police station, Nyoshi Gleaves, Hicks's girlfriend, drove by Sunny's in Hicks's Range Rover with Hicks in the passenger seat and her two-year-old daughter in the back seat.  Police stopped the car, which Sarris and Sabatino identified as the same Range Rover they had seen around the time of the robbery, questioned Gleaves and Hicks separately, and placed them both under arrest.  At the request of the police, Mrs. Tam looked in the back of the Range Rover and identified clothing worn by one of the robbers and cigars from her store.[4]  Mrs. Tam also identified Cooper as the person who struck her husband with a gun during the robbery.

After Hicks was taken into custody, he was given Miranda warnings and agreed to speak with the police.  In his statement, Hicks denied being present during the robbery.[5]  He stated he had loaned his car to Khalil Gissendanner (his younger cousin), "Shiz" (i.e., S.B.), and Cooper the previous evening (December 26) and had spent the night at Gleaves's home.  According to his statement, Hicks spoke to Gissendanner by phone around 5:00 a.m. on December 27, while

---

[3] S.B. was a juvenile at the time of the robbery.

[4] The Range Rover was later searched pursuant to a warrant, and police recovered five sealed boxes of cigars and a medium-sized black hooded sweatshirt.

[5] Although Hicks did not testify at trial, his statement was admitted.

Gissendanner was driving the car back to Gleaves's apartment.[6]  Gissendanner told Hicks he had

to leave S.B. and Cooper in the area of Rhawn Street and Roosevelt Boulevard, but did not

explain why.  He asked Hicks to go back and pick up his friends.  Hicks told Gleaves he had to

go get Gissendanner's "little homies" and encouraged her to come with him to get medicine for

her daughter, who was sick.  Trial Tr. 124, Nov. 2, 2011.  When the police asked Hicks what

they would find if they searched Gleaves's home, he responded "[n]othing that I know of."  *Id.*

At some point on December 27, police officers went to Gleaves's apartment at 3501

Woodhaven Road in Philadelphia and found Gissendanner there.   The officers searched

Gissendanner and seized $1,390 in cash from his person, but did not take a statement from him.

Later the same day, detectives executed a search warrant at Gleaves's apartment and found a

black zippered purse/money bag and a red envelope with Chinese writing on it, both of which

were identified as having been stolen from Sunny's.  The bag and envelope contained a total of

$6,126 in cash.[7]  Both the black bag and the red envelope were found inside a white canvas bag

with the words "Harrison Heart Childcare" and photographs of Gleaves's daughter printed on it.

The detectives found the canvas bag containing the stolen money on a shelf in the walk-in closet

in Gleaves's bedroom.

About three hours after the robbery, the police received information that two semi-

automatic pistols, two pairs of gloves, and a scarf had been found inside a mailbox a couple of

---

[6] Hicks told police that Gissendanner called him around 5:00 a.m., but did not specify on what phone.  Trial Tr. 123, Nov. 2, 2011.  Hicks stated he did not answer the call, but called Gissendanner right back.  *Id.*  According to Gleaves, although Hicks's cell phone was in her house on the night of December 26, the phone was dead.  Trial Tr. 95, Nov. 3, 2011.  Gleaves's own cell phone was in Hicks's Range Rover, where she had left it earlier in the day on the 26th. *Id.* at 54-55.

[7] The Tams had estimated that $10,000 had been stolen on the night of the robbery.  Trial Tr. 83, Nov. 2, 2011.

4

blocks away from the location of the robbery.  The police submitted the guns for DNA analysis, but no DNA was retrieved.  No other physical evidence in the case was submitted for DNA analysis.[8]

Hicks, Cooper, S.B., and Gleaves were all initially charged in state court with various offenses in connection with the Sunny's robbery.  In May 2011, Hicks and Cooper were indicted on federal charges of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); Hobbs Act robbery and aiding and abetting, in violation of 18 U.S.C. §§ 1951(a) and 2 (Count 2); and using and carrying, and aiding and abetting the use and carrying of, a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1) and 2 (Count 3).  Hicks was also charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 4).  S.B. and Gleaves were not charged with federal offenses.

Following his indictment, Cooper met with federal agents in June and October 2011 and ultimately entered into a cooperation plea agreement with the Government.[9]  When he met with agents on June 6, 2011, Cooper initially lied, denying any involvement in the robbery and maintaining he never entered Sunny's but stayed in the Range Rover.  After agents confronted him and warned him he could be charged with obstruction of justice, Cooper admitted he went into the residence, but denied having a gun.  In later proffer sessions with the Government in October 2011, Cooper provided more detail regarding his involvement in the robbery.  He also told agents that while he and Hicks were in jail together after their arrests, Hicks admitted he had

---

[8] In August 2012, Hicks filed a post-trial motion to have the scarf submitted for DNA testing. The Court denied the motion in April 2013.

[9] Cooper did not actually sign his guilty plea agreement until just prior to testifying against Hicks on November 3, 2011.

participated in a robbery of the China Moon restaurant on MacDade Boulevard in Delaware County in November or December 2008. *See* Def.'s Mot. for New Trial Ex. B, at 3.[10]  Prior to trial, the Government moved in limine to admit, pursuant to Federal Rule of Evidence 404(b), Hicks's alleged admissions to Cooper regarding his involvement in the China Moon robbery.[11] Following argument on the motion, the Government agreed to withdraw it, and evidence regarding uncharged robberies was not presented.

At trial, Cooper testified pursuant to the terms of his plea agreement, providing the only direct evidence of Hicks's involvement in the Sunny's robbery.  Cooper testified that earlier in the day on December 26, 2008, he and Hicks had discussed committing a burglary, but did not discuss who else would participate.  Late in the evening on December 26, Cooper went to a movie with his girlfriend, Rameira Taylor, who is also Hicks's sister.[12]  Taylor received a call during the movie and told Cooper that Hicks was going to pick them up from the theater.  At the end of the movie, sometime after midnight or 1:00 a.m., S.B., Gissendanner, and a third male by the name of "G" (whom Cooper stated he did not know) picked up Cooper and Taylor in Hicks's Range Rover with S.B. driving.  The group first drove Taylor home, then proceeded to Gleaves's house to meet with Hicks.  When they arrived, Gissendanner went into Gleaves's house, and

---

[10] Citations to Hicks's motion for a new trial and the exhibits thereto are to the motion filed on September 20, 2013 (ECF No. 161), and not to Hicks's original motion (ECF No. 150), which was filed before the trial transcripts were prepared.

[11] The Government also sought to admit evidence of Hicks's alleged admissions to Cooper regarding his involvement in a December 2008 burglary of a Chinese store at 38th and Landsdowne Streets in Philadelphia.  Def.'s Mot. for New Trial Ex. A, at 6.  This offense is not mentioned in the memorandum summarizing Cooper's October 2011 proffer sessions.  *See* Def.'s Mot. for New Trial Ex. B.

[12] At the time of the trial, in November 2011, Cooper had known Hicks through his relationship with Taylor for about three years.  Cooper saw Hicks regularly, but did not socialize with him.

6

Hicks, Cooper, S.B., and G got back into the car and drove to Sunny's, parking about a block away on Leonard Street.  Cooper stated Hicks was wearing blue jeans and a black hoodie.

Cooper testified that after sitting in the parked car for about half an hour, Hicks exited the car and walked up Leonard Street toward Rhawn Street and into the alleyway that runs behind Sunny's.  Hicks returned to the Range Rover and spoke to G, who accompanied him back into the alleyway.  Hicks and G then returned to the Range Rover for Cooper, and the three proceeded to break into the Tam residence above Sunny's, entering through a door on the second floor by climbing a ladder to a first-floor roof deck and breaking the glass in the door to unlock it.[13]  The group began looking for money and items of value on the second floor, then Cooper went downstairs into the store while Hicks and G proceeded upstairs to the third floor.  After a few minutes, Cooper went to the third floor, where he saw Hicks taking a female into another room at gunpoint.  Surprised, Cooper quickly went back downstairs.[14]  He intended to leave the scene, but inadvertently passed the second floor exit and proceeded back down to the store.  Realizing his mistake, Cooper ran back to the second floor and left the way he entered.  As he was climbing down the ladder to the ground, Cooper saw Hicks and G run down Leonard Street to the Range Rover, get into the car, and drive away, turning right from Leonard Street onto Loney Street before disappearing from view.  Along with S.B., whom he encountered on the roof

---

[13] Although Cooper stated S.B. was still in the Range Rover when Cooper followed Hicks and G to the alley, he also testified S.B. eventually entered the building.

[14] Cooper stated he had not been expecting to enter a residence where he might encounter people and claimed he stayed on the third floor for only about seven or eight seconds.

and who climbed down the ladder with him, Cooper ran in the direction of the Range Rover.  As they were running, Cooper discarded the scarf and gloves he was wearing in a sewer.[15]

After the robbery, Cooper and Hicks were cellmates briefly while incarcerated.  Cooper testified that during this time, Hicks told him he had hidden the money from the robbery in his residence and indicated he hoped the police would not trace the firearm he had used back to him. Hicks also told Cooper the police would not be able to prove Hicks had stolen the Dutch Masters cigars found in his car because he had a receipt for them.  In addition, Hicks explained that after the robbery, he had gone home and changed his clothes before coming back out to look for Cooper and S.B.

On cross-examination, defense counsel sought to portray Cooper as a liar, questioning him at length about the false statements he made to federal agents concerning his involvement in the robbery when he was interviewed on June 6, 2011, and his delay in signing in a plea agreement, which counsel speculated was due to Cooper's refusal to admit the full extent of his involvement in the robbery.  Defense counsel also cross-examined Cooper about his desire for a more lenient sentence in exchange for his cooperation and highlighted several inconsistencies between his trial testimony and the summary of his October 2011 interviews.[16]

Gissendanner also testified for the Government and corroborated significant aspects of Cooper's account, including that Cooper, S.B., and G had driven him to Gleaves's apartment, where they dropped him off, picked up Hicks, and left again in Hicks's Range Rover in the early morning hours on December 27.  Gissendanner stated he had asked Hicks on December 26 to

---

[15] Cooper denied possessing a firearm at any time on December 27, 2008, or disposing of any firearm in a mailbox.

[16] For example, counsel highlighted numerous details to which Cooper testified at trial that were not included in the interview summary.

take him to the Franklin Mills shopping mall to buy a late Christmas present for his mother. Gissendanner planned to spend the night with Hicks at Gleaves's apartment so that Hicks could drive him to the mall the following day, on December 27.  Gissendanner was expecting Hicks to pick him up on December 26, but instead S.B. arrived in Hicks's Range Rover.   By Gissendanner's account, he and S.B. then picked up Cooper and Taylor from a movie theater and dropped Taylor off at home before driving to North Philadelphia to pick up G, whom Gissendanner had never met.[17]   S.B., Cooper, G, and Gissendanner then drove to Gleaves's house and exited the Range Rover.  Hicks met the group at the door and told Gissendanner to go in the house with Hicks's four-year-old son while Hicks and the others went to the store. Gissendanner entered the house and found Hicks's son watching television in a bedroom on the second floor.  Gissendanner watched television with the son and then went to sleep on the floor of the bedroom.  At some point, Gissendanner was awakened briefly by Hicks, who told him to look after his son.  When he awoke later in the morning on the 27th, no one was at the apartment. Gissendanner called Hicks's phone a few times, but got no answer.  A few minutes later a police officer knocked on the door and told Gissendanner a robbery had taken place.  The officer searched Gissendanner and found $1,390 in cash, which Gissendanner claimed was a combination of his earnings from working for Aramark and the Phillies and a $300 cash Christmas gift from his mother.[18]   Gissendanner denied entering Gleaves's bedroom, where officers found the approximately $6,000 in cash, at any time while he was in her apartment.  He also denied participating in the robbery, and denied Hicks's statements that he borrowed Hicks's

---

[17] Gissendanner admitted he knew Cooper, who was the father of his cousin's baby, but denied being friends with either Cooper or S.B.

[18] Gissendanner's money was eventually returned to him after he produced his paystubs to the state court.

Range Rover on the night of the robbery and later asked Hicks to pick up people he had left behind.

Like Cooper, Gissendanner admitted to lying to federal agents during his initial interview, but professed to be testifying truthfully at trial. On cross-examination, Gissendanner admitted he lied when he told agents during the interview that Hicks picked him up at 6:00 p.m. on December 26 and took him to Gleaves's home, where he remained for the rest of the night. Gissendanner also admitted he never mentioned to agents that he was with S.B., Cooper, and G on the 26th and 27th, and falsely denied knowing S.B. and Cooper. Gissendanner stated he lied to protect Hicks, but told the truth after the agent showed him Hicks's statement.

Gleaves also testified for the Government at trial. Gleaves stated she and Hicks had gone to bed at 9:00 or 9:30 p.m. on December 26, were intimate an hour later, and then went back to sleep. Around 1:00 or 2:00 a.m. on December 27, Gleaves's father called her landline and said someone had been calling his house from her cell phone looking for Hicks. Gleaves had left her cell phone in Hicks's Range Rover earlier in the day. Gleaves told Hicks about the call and went back to sleep. Hours later, she was awakened by her daughter, who had entered Gleaves's bedroom crying because she had wet herself. Gleaves took her daughter into the bathroom and then back into the daughter's bedroom, where she noticed a fully dressed male (Gissendanner) sleeping on the floor. Gleaves took her daughter back into her own bedroom with her and, noticing Hicks was not there,[19] called Hicks, first on his cell phone (which went straight to voicemail), then on her cell phone. Hicks answered and told Gleaves he was right downstairs, though Gleaves did not hear the phone ring inside the house. After the call, Gleaves heard the

---

[19] Gleaves testified she first noticed Hicks was not in bed when she returned to her bedroom after tending to her daughter. She did not notice whether Hicks was in bed when she first woke, as she was focused on her daughter.

front door to the apartment close, and Hicks came upstairs wearing the same shorts and T-shirt he had worn to bed the night before.[20]  Hicks asked Gleaves whether she was still taking her daughter to her mother's house while she worked that day.  Gleaves took her daughter into the bathroom to get dressed while Hicks dressed in the bedroom.[21]  When Gleaves went back into her bedroom, Hicks was coming out of her walk-in closet, where he would sometimes change clothes.  Hicks told Gleaves to hurry and get ready, stating he wanted her to drop him off at Bridge and Pratt Streets in Philadelphia.

Gleaves and Hicks left in the Range Rover with Gleaves driving and her daughter in the back seat.  Gleaves started to drive toward I-95, her usual route to her mother's house, but Hicks told her to take Roosevelt Boulevard.  As they approached the intersection of Rhawn Street and the Boulevard, Hicks told Gleaves to turn onto Rhawn Street, where a number of police officers were stationed.  Gleaves instead proceeded down Roosevelt Boulevard, wanting to avoid the police activity on Rhawn Street.  Upon seeing the police cars, Hicks commented, "I think they locked my homies up."  Trial Tr. 72, Nov. 3, 2011.  Hicks also began yelling at Gleaves, who turned off Roosevelt Boulevard and drove back around to Rhawn Street.  While stopped at a red light, Gleaves noticed officers pointing at the Range Rover and voiced her concern to Hicks.  Hicks told Gleaves not to worry and instructed that, if asked, she should tell the police they were going to Walgreens to get medicine for her daughter.[22]  Gleaves testified that while the car was

---

[20] Gleaves stated Hicks came upstairs carrying only her cell phone, which had been in the Range Rover.

[21] Gleaves estimated she and Hicks were dressing at around 5:00 or 6:00 a.m., a normal time for Gleaves to leave for her job as a hospice aide on a Saturday.

[22] Gleaves testified she had mentioned to Hicks the previous night that she needed to stop at Walgreens to get Albuterol for her daughter's asthma before taking her daughter to her mother's house; however, she and Hicks did not plan to go to Walgreens on the morning of December 27.

stopped, police officers "flooded the vehicle with guns drawn," told Gleaves and Hicks to step out of the car, and questioned them separately.  *Id.* at 68.  The officers asked Gleaves if she knew Cooper and S.B., who were being arrested.  Gleaves could only see S.B., whom she recognized as a friend of Hicks.

On November 7, 2011, a jury convicted Hicks of the first three counts of the indictment. After the jury returned its verdict, this Court found Hicks guilty of the fourth count (being a felon in possession of a firearm).  Following Hicks's trial, Cooper pleaded guilty to the charges against him pursuant his guilty plea agreement.

While Cooper was on bail awaiting sentencing, he was arrested for another gunpoint robbery.  Cooper was later indicted on federal charges arising out of this new offense, to which he ultimately pleaded guilty.  *See United States v. Cooper*, No. 12-119 (E.D. Pa. filed Mar. 22, 2012).[23]  During a July 27, 2012, proffer session with the Government in connection with his new federal charges, Cooper told federal agents he had been involved in three robberies of Asian business owners in December 2008:   (1) a robbery of a Chinese restaurant in Glenolden, Pennsylvania, which was later determined to be the China Moon robbery Cooper had previously told agents Hicks had committed; (2) a robbery of a Chinese restaurant in the area of 56th Street and Landsdowne Avenue in Philadelphia; and (3) an attempted robbery of a Chinese restaurant in the vicinity of 60th and Market Streets in Philadelphia.[24]  Def.'s Mot. for New Trial Ex. E.

---

[23] Cooper was charged with Hobbs Act robbery, using and carrying a firearm during and in relation to a crime of violence, and being a felon in possession of a firearm.

[24] In a proffer session on April 10, 2013, Cooper confirmed the Glenolden robbery was the same as the China Moon robbery.  Defs.' Mot. for New Trial Ex. F.  It is not clear whether either of the other two robberies in which Cooper admitted his involvement is the same as the second offense referenced in the Government's Rule 404(b) motion in this case (i.e., the December 2008 burglary of a Chinese store at 58th and Landsdowne Streets in Philadelphia).

Cooper told agents he had committed all three of these robberies with his friend Oronda Ligon and Ligon's cousin had participated in the third robbery.  *Id.*  Cooper also told agents about other robberies Ligon had admitted to committing in October and November 2011.

In March 2013, Cooper testified against Ligon at his trial on charges arising out of a May 2011 robbery.  On cross-examination, Ligon's attorney confronted Cooper with his statements to federal agents in connection with the Sunny's robbery investigation in June and October 2011, confirming Cooper had told agents that Hicks had committed the China Moon robbery with a person named Raheem.  Def.'s Mot. for New Trial Ex. G, at 27.  In response to counsel's questioning, Cooper admitted he falsely implicated Hicks and Raheem in the China Moon robbery when in fact Cooper himself had committed the robbery with Ligon.  *Id.* at 31-32. Ligon's counsel also confronted Cooper with his plea agreement in this case, in which Cooper agreed he would not "falsely implicate any person or entity" and would not "protect any person or entity through false information or omission."  *Id.* at 31.  Cooper admitted that despite these representations in his plea agreement, he did not tell agents before testifying against Hicks that he had falsely implicated Hicks in the China Moon robbery or that he had committed either the China Moon robbery or the other two robberies he later disclosed.  *Id.* at 32.

After Cooper testified against Ligon in March 2013, Ligon's attorney alerted Hicks's counsel that Cooper had admitted to falsely implicating Hicks in the China Moon robbery.  Hicks thereafter filed the instant motion for a new trial based on newly discovered evidence in June 2013.[25]  After obtaining the trial transcripts in this case, the parties briefed the motion in September 2013, and oral argument was held in October 2013.

---

[25] Hicks filed his motion for a new trial the day before his scheduled sentencing hearing.  At defense counsel's request, the Court continued the sentencing hearing pending disposition of the instant motion.

13

**DISCUSSION**

Federal Rule of Criminal Procedure 33 authorizes a district court, on a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When a defendant seeks a new trial based on newly discovered evidence, a court may grant the motion only if the following five requirements are met:

> (a) the evidence must be in fact newly discovered, i.e. discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Quiles*, 618 F.3d 383, 388-89 (3d Cir. 2010) (quoting *United States v. Saada*, 212 F.3d 210, 216 (3d Cir. 2000)). The defendant bears the "heavy burden" of proving each of these requirements. *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006). "If just one of the requirements is not satisfied, a defendant's Rule 33 motion must fail." *United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008).

Hicks argues a new trial is warranted based on newly discovered evidence that Cooper (1) admitted to having falsely implicated Hicks in the China Moon robbery in his proffer sessions with federal agents in October 2011, (2) lied during his proffer sessions by failing to disclose his own involvement in the China Moon robbery and other robberies, and (3) perjured himself at trial by denying he had continued to lie to agents after initially lying to them during his June 6, 2011, interview. The Government argues Hicks's motion should be denied because this evidence does not meet any of the above-referenced requirements for a new trial.

As to the first requirement, the Government argues the evidence on which Hicks's motion is based is not newly discovered because the Government's Rule 404(b) motion alerted Hicks that Cooper had lied to the Government about Hicks's involvement in the China Moon robbery

prior to trial.  The Government also argues Hicks has failed to satisfy the second requirement because he has given no indication he took any steps to prove Cooper had falsely implicated him in other crimes, despite his knowledge that Cooper had done so.

Insofar as Hicks's motion is based on Cooper's post-trial admission that he falsely implicated Hicks in the China Moon robbery, case law provides some support for the Government's position.  *See Sistrunk v. Rozum*, 674 F.3d 181, 188-89 (3d Cir. 2012) (holding a letter from a prosecution witness admitting to perjuring himself at the defendant's preliminary hearing more than 10 years earlier by identifying the defendant as the person who shot the victim was not "newly discovered" for purposes of 28 U.S.C. § 2244(d)(1)(D) because the defendant knew the "vital facts" underlying the letter—i.e., that the witness had perjured himself when implicating the defendant—years earlier);[26] *United States v. Jasin*, 280 F.3d 355, 362 (3d Cir. 2002) (holding the newly available testimony of a codefendant who invoked his Fifth Amendment privilege against self-incrimination and did not testify at trial does not constitute newly discovered evidence for purposes of Rule 33 when the defendant was aware of the substance of the testimony the codefendant would have given at trial); *see also United States v. Webster*, 516 F. App'x 182, 185 (3d Cir. 2013) (holding a written statement from the defendant's father indicating the father owned and solely possessed a gun the defendant was convicted of

---

[26] The issue before the Court of Appeals in *Sistrunk*, on which the Government relies, was whether the recantation letter constituted "new" evidence for purposes of § 2244(d)(1)(D), which delays the running of the federal habeas statute of limitations until "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," not whether the letter was "newly discovered" for purposes of Rule 33. Nevertheless, in holding the letter did not fit within the statute's definition of "new" evidence, the Court relied on case law from the Rule 33 context.  *Sistrunk*, 674 F.3d at 189 ("Because evidence that is 'previously known, but only newly available' does not constitute 'newly discovered evidence,' we will not construe the evidence of innocence [defendant] offers as 'new.'" (quoting *Jasin*, 280 F.3d at 362 (a Rule 33 case))).  It is not clear, however, whether the holding of *Sistrunk* applies in the Rule 33 context.

illegally possessing was not newly discovered because the information in the statement was known to the defendant during trial); *Shore v. Warden*, 942 F.2d 1117, 1124 n.5 (7th Cir. 1991) (holding a prosecution witness's post-trial recantation of aspects of her trial testimony did not constitute newly discovered evidence because the defendant knew the witness was lying during trial).

Hicks's motion, however, is not based solely on this admission, but is also based on Cooper's failure to disclose his own involvement in the China Moon robbery and other similar crimes, in violation of his guilty plea agreement in this case.[27]  There is no evidence Hicks was

---

[27] Although Hicks also maintains Cooper perjured himself at trial by denying he continued to lie to agents after lying to them initially during a June 6, 2011, interview, the Court is not persuaded Cooper's testimony amounts to perjury.  Hicks's perjury allegations are based primarily on the following exchange during Cooper's direct examination:

> Q    The—during that same statement that you gave to the FBI agents on June 6th, 2011, you said you didn't—you didn't tell them the truth from the beginning?
> A    Yes.
> Q    And after—after lying, right, you gave them a lie, right?
> A    Yes.
> Q    After lying, while you were still with them, did you—did you continue to lie?
> A    No.
> Q    Okay.  What did you tell FBI agents?
> A    I told them that I had took part in the—I told them my involvement in the robbery.

Trial Tr. 113-14, Nov. 3, 2011.  Hicks argues Cooper's denial that he continued to lie to agents after lying to them initially constitutes perjury because Cooper "impl[ied] that his statements in October of 2011 were . . . truthful," when in fact Cooper had falsely implicated Hicks in the China Moon robbery.  Def.'s Mot. for New Trial 3.  Cooper's denial, however, came in response to the question whether he continued to lie to agents "while [he was] still with them," i.e., on June 6, 2011.  Trial Tr. 114, Nov. 3, 2011.  The denial thus pertained only to his interview by agents on June 6, before he falsely implicated Hicks.  In response to later questioning about whether he had continued to change his story from June 2011 to October 2011, Cooper stated he "told [the agent] the truth when he came out in October."  *Id.* at 212.  Viewed in context, however, it is clear Cooper was claiming to have told the agent the truth about the Sunny's robbery.  As a result, this statement also does not show Cooper perjured himself by failing to disclose that he lied about Hicks's involvement in other robberies.  Finally, the Court notes that

aware Cooper himself had committed the very robbery in which he falsely implicated Hicks until Hicks's counsel learned that Cooper had admitted his involvement in the robbery at Ligon's trial in March 2013.  Moreover, the Government does not dispute that defense counsel brought this information to the Court's attention promptly after learning of it.  Thus, Hicks's motion appears to be based at least in part on newly discovered evidence.

Even assuming all of the evidence on which Hicks's motion is based is newly discovered, to obtain a new trial, Hicks must also show the evidence is not "merely cumulative or impeaching," is "material to the issues involved," and "would probably produce an acquittal" if Hicks were retried.  *Quiles*, 618 F.3d at 388-89 (citation and internal quotation marks omitted).  Hicks concedes the evidence underlying his motion is impeachment evidence, but argues the evidence is not *merely* impeaching because it completely undermines the credibility of Cooper's trial testimony, which was the centerpiece of the Government's case against him.  Although a court ordinarily may not grant a new trial based on newly discovered impeachment evidence, the fact that evidence may be considered impeaching in character does not categorically preclude relief.  Rule 33 "permits courts to grant a new trial when the interest of justice requires it," without distinguishing between impeachment and direct evidence as a basis for granting such a motion.  *Id.* at 391.  Thus, a district court should not "ignore a claim that there has been a miscarriage of justice just because the newly discovered evidence supporting the claim could be categorized as impeachment in character."  *Id.*

At the same time, the Third Circuit Court of Appeals has recognized that newly discovered evidence that is "*merely* impeaching"—without more—is unlikely to reveal a

---

even if Cooper's statements amounted to perjury, the perjury is not newly discovered, as Hicks knew at trial that Cooper had falsely implicated him.

miscarriage of justice. *Id.* at 392. For impeachment evidence to warrant a new trial, the defendant must show either (1) a strong exculpatory connection between the newly discovered evidence and the facts presented at trial or (2) that the newly discovered evidence, "though not in itself exculpatory, throw[s] severe doubt on the truthfulness of the critical inculpatory evidence that had been introduced at the trial." *Id.* at 392-94.

The Court agrees with Hicks that evidence that Cooper lied to agents, and was apparently prepared to lie at trial, about Hicks's alleged involvement in at least one other similar robbery that Cooper himself committed is the kind of evidence that could qualify as more than "mere" impeachment evidence.[28] In *Quiles*, the Court of Appeals held newly discovered evidence that, following trial, a confidential informant and key government witness was convicted of sex offenses involving a minor, in violation of his written pledge not to commit any crimes while working for the government, was merely impeaching and thus did not warrant a new trial. *Id.* at 394-95. The Court reasoned that showing the informant had violated the terms of his government agreement by committing crimes was "not a sufficient basis to suggest that his entire work as a confidential informant was a sham," in part because his crimes had nothing to do with his work as an informant. *Id.* In so holding, the Court distinguished the situation before it from

---

[28] Hicks does not argue there is a strong exculpatory connection between the new evidence regarding Cooper's deception and the facts presented at trial. Because the new evidence concerns Cooper's involvement in—and lies about Hicks's involvement in—robberies other than the Sunny's offense for which Hicks was charged in this case, the evidence does not have an exculpatory connection to the Sunny's robbery charge. *See id.* at 393-94 & n.19 (observing newly discovered evidence that the sole alleged eyewitness to a crime was actually in prison miles away from the scene at the time the crime was committed, while devastating to the government's case, "would not have an 'exculpatory connection' to the charge against the defendant and would not support an inference that the defendant was not guilty of the charge against him," though such evidence might nevertheless warrant a new trial on the basis that it "destroy[ed] critical trial evidence").

one in which the informant was shown to have "committed blatant perjury" in other cases, noting such evidence "might be reason to doubt [the informant's] testimony in this case." *Id.*

In defining the inquiry a court should undertake to determine whether impeachment evidence can be a basis for a new trial, the Court in *Quiles* also commented on a series of cases in which other courts have held newly discovered impeachment evidence could warrant a new trial. The Court observed that *United States v. Lipowski*, 423 F. Supp. 864 (D.N.J. 1976), involved "new evidence strongly suggest[ing] that the conviction was based on fabricated evidence"; *United States v. Taglia*, 922 F.2d 413 (7th Cir. 1991), involved "new evidence show[ing] that a key witness routinely committed perjury when testifying as an informant"; and *United States v. Davis*, 960 F.2d 820 (9th Cir. 1992), involved "new evidence show[ing] that the primary witness was a 'crooked cop' who had been caught tampering with (in fact, stealing) evidence." *Quiles*, 618 F.3d at 393. Although the Court made clear it was not citing the foregoing cases "in an attempt to define the exact 'exculpatory connection' required," it distinguished them from its own prior holding in *United States v. Saada*, 212 F.3d 210 (3d Cir. 2000), that evidence that a cooperating witness had advised a friend to give false testimony in an unrelated case in exchange for a reduced sentence was "'only' impeaching, because there was 'no exculpatory connection' between the new evidence and defendants' criminal acts." *Quiles*, 618 F.3d at 393.

Here, Cooper admitted under oath that he lied to the Government, falsely implicating Hicks (and another innocent third party) in at least the China Moon robbery in an effort to conceal his own involvement in that robbery. While Cooper did not testify at trial about Hicks's alleged involvement in the China Moon robbery, he was apparently prepared to do so, prompting the Government to seek a ruling that such testimony would be admissible under Rule 404(b).

Cooper continued to conceal his involvement—and Hicks's lack of involvement—in the China Moon robbery for almost a year before disclosing this information to different federal agents as part of his effort to cooperate with the Government in connection with a separate federal charge. *See* Def.'s Mot. for New Trial Ex. G, at 44 (stating Cooper told agents Hicks did not commit the China Moon robbery in October 2012). Unlike in *Quiles*, where the informant's violation of his agreement with the Government was "a course of conduct wholly different from that of a person fabricating testimony," Cooper's lies about Hicks's involvement in the China Moon robbery provide "reason to doubt his testimony in this case."[29] 618 F.3d at 395. The Court therefore agrees this evidence could qualify as more than mere impeachment evidence.[30]

Nevertheless, even when newly discovered impeachment evidence has the requisite exculpatory connection to the offense of conviction or undermines critical inculpatory evidence, a new trial is not warranted unless the defendant shows the new evidence would probably produce an acquittal at a new trial. *See United States v. Mensah*, 434 F.3d 123, 127 (3d Cir. 2011); *Quiles*, 618 F.3d at 392 n.14, 394 n.19; *Saada*, 212 F.3d at 217. In undertaking this "probability-of-acquittal" inquiry, a court must weigh the new evidence "against all of the other evidence in the record." *Kelly*, 539 F.3d at 189. "Where a particular piece of evidence presented at trial is challenged as tainted, [the Third Circuit] ha[s] denied motions for a new trial where

---

[29] This is not to say a jury hearing that Cooper had falsely implicated Hicks in another robbery would be compelled to conclude he was lying about Hicks's involvement in the Sunny's robbery. In this regard, it bears mention that Ligon was convicted of Hobbs Act robbery following a trial at which Cooper testified and was cross-examined about having falsely implicated Hicks.

[30] As noted above, the Court assumes, for purposes of this analysis, that all of the evidence on which Hicks's motion is based, including the evidence of Cooper's post-trial admission that he falsely implicated Hicks in the China Moon robbery, is newly discovered. It is doubtful that evidence of Cooper's own involvement in other robberies, standing alone, could qualify as more than mere impeachment evidence.

there was sufficient independent evidence to sustain a finding of guilt." *Mensah*, 434 F. App'x at 127 (citing *Saada*, 212 F.3d at 217 n.6); *see also Quiles*, 618 F.3d at 392 n.14, 394 n.19; *Davis*, 960 F.2d at 825-26 (assuming newly discovered evidence of a prosecution witness's involvement in a conspiracy to steal confiscated drug money from the sheriff's department would completely destroy the witness's credibility, but affirming the denial of defendants' motion for a new trial because the remaining evidence was sufficient to support their convictions); *Taglia*, 922 F.2d at 415-16 (affirming the denial of a motion for a new trial based on newly discovered evidence that the main prosecution witness had previously provided false testimony regarding one of the defendants in an unrelated case, where the witness's testimony was corroborated by tape recordings which "demonstrat[ed] beyond serious doubt that the defendants committed the crimes of which they were convicted"). Hicks has not made the required showing in this case.

A conviction for Hobbs Act robbery "requires proof beyond a reasonable doubt that (1) the defendant knowingly or willfully committed . . . robbery[31] . . . , and (2) the defendant's conduct affected interstate commerce." *United States v. Powell*, 693 F.3d 398, 401 (3d Cir. 2012). Based on the testimony of the Tam family, the Government established both that a robbery occurred and that the robbery affected interstate commerce. All four members of the Tam family testified that a group of masked men broke into the residence above Sunny's and forced the family into a bathroom at gunpoint, striking Mr. Tam in the head with a gun in the process. Mr. and Mrs. Tam also testified the robbers stole money from their business which had

---

[31] The statute defines the term "robbery" to mean "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, . . . or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1).

not yet been deposited in the bank, cigars from the store, and other items.  In addition, Mrs. Tam testified she and her husband sold a variety of items at Sunny's, including Corona beer from Mexico.  *See id.* at 404-05 (holding targeting the proceeds of a store engaged in interstate commerce satisfies the Hobbs Act's jurisdictional element, even if the robbery itself occurs outside the confines of the victim's store).

Hicks argues without Cooper's testimony, the remaining evidence presented at trial was insufficient to prove he was one of the robbers.[32]  The Court disagrees.  As the only witness who professed to have direct knowledge of Hicks's involvement in the robbery, Cooper was undeniably an important part of the Government's case.  But the Government also presented significant other circumstantial evidence of Hicks's guilt.  Gissendanner testified that Hicks left Gleaves's apartment in the Range Rover with Cooper, S.B., and G in the early morning hours on the date of the crime, thereby placing Hicks with individuals who were identified as participants in the robbery (i.e., Cooper and S.B.) in the same vehicle Sarris and Sabatino identified as the vehicle in which two of the robbers fled after leaving Sunny's.  Gleaves's testimony that Hicks was in bed with her when her father called her apartment around 1:00 or 2:00 a.m. on December 27, but was not there a few hours later, is consistent with Gissendanner's statement that Hicks left the apartment for some period of time in the early morning hours on the date of the robbery.  Gleaves also testified that upon noticing Hicks was not in bed, she called him on her cell phone,

---

[32] In his motion, Hicks argues the newly discovered evidence regarding Cooper's deception would probably result in an acquittal "because the nature of the deception involves the concealing of Cooper's involvement [in] a similar crime . . . in which he falsely implicated Hicks."  Def.'s Mot. for New Trial 9.  The motion does not, however, address the sufficiency of the remaining evidence to support his conviction.  At oral argument, Hicks took the position the remaining evidence was insufficient because only Cooper placed him at the robbery scene.  The Court thus understands Hicks to be primarily challenging the sufficiency of the remaining evidence to prove Hicks was one of the robbers.

which she had left in the Range Rover, and he answered, apparently on his way back into the apartment as Gleaves heard the front door shut after hanging up the phone.

The circumstances surrounding Hicks's return to the robbery scene with Gleaves after the offense was completed provide additional circumstantial evidence of his involvement in the robbery. Gleaves testified that after Hicks came back into the apartment with her cell phone, he hurried her to get ready for work, insisted she drive by the robbery scene rather than taking her usual route to her mother's house, and, when the Range Rover was stopped by the police, told her to lie to the police about where she and Hicks were going. Gleaves also testified that upon seeing police cars on Rhawn Street, Hicks commented, "I think they locked my homies up." Trial Tr. 72, Nov. 3, 2011. Although Hicks gave a statement in which he claimed he went to the area of Rhawn Street and Roosevelt Boulevard to pick up Cooper and S.B. at Gissendanner's request, Gissendanner contradicted Hicks's account at trial, denying any involvement in the robbery and denying having asked Hicks to pick anyone up.

After police stopped Gleaves and Hicks in the Range Rover, Kitty Tam identified a black hooded sweatshirt in the back of the car as having been worn by one of the robbers and identified several sealed boxes of Dutch Masters cigars as having been stolen from Sunny's. In addition, the Tams' black money bag and red envelope with Chinese writing, both containing money stolen during the robbery, were later found hidden in Gleaves's closet, from which Gleaves saw Hicks emerge shortly before they left the apartment. While Hicks argued Gissendanner could have been the source of these items, a jury could also infer that Hicks hid them in Gleaves's closet following the robbery. At trial, Gissendanner denied entering Gleaves's bedroom, and although he was found with $1,390 in cash on his person when police encountered him at Gleaves's apartment after the robbery, he was ultimately able to obtain return of the money by

producing his pay stubs.  The Court agrees with the Government that the foregoing circumstantial evidence was sufficient to show Hicks's participation in the robbery.

Even without Cooper's testimony, the evidence presented at trial was also sufficient to show Hicks conspired with Cooper and others to commit the robbery.  The essential elements of a conspiracy to commit Hobbs Act robbery are "(1) a shared unity of purpose, (2) an intent to achieve a common goal, . . . (3) an agreement to work together toward the goal, and (4) the commission of an overt act to further the conspiracy."  *United States v. Carter*, 536 F. App'x 294, 297 (3d Cir. 2013) (internal citations and quotation marks omitted).  "[T]he agreement necessary for a conspiracy 'can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.'"  *United States v. Lowe*, 222 F. App'x 220, 224 (3d Cir. 2007) (quoting *United States v. Pressler*, 256 F.3d 144, 149 (3d Cir. 2001)).  At trial, the Tams testified the robbers entered their residence as a group, acted in concert to remove the family members from their rooms and force them all into a bathroom at gunpoint, and demanded money.  For example, Mrs. Tam recounted that two of the robbers pushed her children into her room, one robber holding onto each child, while two more robbers held onto her husband, one hitting him on the head as he tried to get to the phone.  Trial Tr. 68-69, Nov. 2, 2011.  A jury finding that Hicks participated in the robbery could also find, based on the Tams' description of events on the night of December 27, that Hicks conspired with the other robbers to commit the robbery.

Hicks does not specifically challenge the sufficiency of the Government's remaining evidence, apart from Cooper's testimony, to support his firearms convictions.  Section 924(c) prohibits a person from using or carrying a firearm during and in relation to any crime of

violence.  18 U.S.C. § 924(c)(1)(A).  Hicks was charged not only with a substantive violation of the statute but also on a theory of aiding and abetting.  To obtain a conviction on an aiding and abetting theory, the Government must show (1) one of the robbers committed the substantive offense of using and carrying a firearm during and in relation to a crime of violence; (2) Hicks "knew of the commission of the substantive offense and acted to facilitate it"; and (3) Hicks specifically intended to facilitate the crime.  *United States v. Mercado*, 610 F.3d 841, 846 (3d Cir. 2010); *see also United States v. Hill*, No. 12-3625, 2013 WL 5452393, at *2 (3d Cir. Oct. 2, 2013).

Robbery "indisputably qualifies as a crime of violence" within the meaning of § 924(c). *United States v. Mendez*, 992 F.2d 1488, 1491 (9th Cir. 1993); *see also* 18 U.S.C. § 924(c)(3) (defining the term "crime of violence" to mean an offense that is a felony and either "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense").  Moreover, the testimony of the Tam family establishes that at least some of the robbers carried and used firearms during and in relation to the Sunny's robbery.  All four of the victims testified that one or more of the robbers visibly carried guns on their persons and pointed the guns at them while ushering them into the bathroom.  Trial Tr. 32, 53, 68, 79, 87-88, Nov. 2, 2011; *see Bousley v. United States*, 523 U.S. 614, 617 (1998) (holding using a firearm includes such actions as "'brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire' the weapon" (quoting *Bailey v. United States*, 516 U.S. 137, 148 (1995))).  Mr. Tam and his daughter also testified that one of the robbers used his gun to strike Mr. Tam in the head.  Trial Tr. 32, 88, Nov. 2, 2011.

Although Cooper was the only witness to identify Hicks as carrying and using a gun during the robbery, Mr. Tam testified that all of the robbers had guns. *Id.* at 92 ("There were four persons with guns—three in the room, one in the hallway."). Thus, a jury finding that Hicks was one of the robbers could also find that Hicks carried a gun during the robbery. Alternatively, based on the Tam family's testimony that the robbers worked together in close proximity to one another to execute the robbery, with at least some of the participants using guns to force the family into the bathroom, a jury finding that Hicks was one of the robbers could find he aided and abetted the use and carrying of a firearm during the robbery. *See Hill*, 2013 WL 5452393, at *3 (upholding a conviction for aiding and abetting a § 924(c)(1) violation based on evidence that the defendant took money from a store cash register while his codefendant brandished a firearm, from which a jury could infer the defendant participated in the robbery knowing a gun was being used and facilitated the use of the firearm by following his partner's instructions to take the money).

As for Hicks's conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), to obtain such a conviction, the government must prove (1) the defendant was previously convicted of a crime punishable by imprisonment for a term exceeding one year; (2) the defendant knowingly possessed a firearm; and (3) the firearm passed in interstate commerce. *United States v. Dodd*, 225 F.3d 340, 344 (3d Cir. 2000). The first and third elements are easily satisfied here. Following the jury's verdict on Counts 1–3, the Court received into evidence a certified record of Hicks's prior felony conviction, and at trial ATF Special Agent Adam Cameron testified that the firearms recovered from a mailbox a short distance from Sunny's following the robbery met the federal definition of a firearm and had traveled in interstate commerce. Trial Tr. 48-49, Nov. 3, 2011. With respect to the element of

knowing possession, the Government may establish this element based on a theory of constructive possession, which "occurs when a person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons." *United States v. Benjamin*, 711 F.3d 371, 376 (3d Cir. 2013) (citations, internal quotation marks, alteration, and emphasis omitted).  Based on the proximity of the mailbox from which the guns introduced at trial were recovered to Sunny's, a reasonable factfinder could conclude the guns were used in the robbery and discarded by one or more of the robbers after the crime.  Even without evidence that Hicks actually possessed one of the guns found in the mailbox, a factfinder could also conclude, based on the Tam family's accounts of the robbery, that Hicks was aware guns were being used during the robbery and had the intention to exercise dominion over the firearms through his coconspirators.  *See United States v. Walker*, 657 F.3d 160, 173-74 (3d Cir. 2011) (holding a rational juror could conclude a defendant had constructive possession of a gun visible on his brother's person during a drug deal in which the brothers were joint participants "because the firearm provided protection to both of them during their sales").

Because the evidence presented at trial was sufficient to sustain Hicks's conviction even without Cooper's testimony, the Court concludes the newly discovered evidence regarding Cooper's deception would not probably produce an acquittal if Hicks were retried.  Accordingly, Hicks's motion for a new trial will be denied.

An appropriate order follows.

BY THE COURT:


   _  /s/ Juan R. Sánchez_____
   Juan R. Sánchez, J.

27